J-S15031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.E.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 8 EDA 2022 |

Appeal from the Decree Entered November 19, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000646-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.E.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 9 EDA 2022 |

Appeal from the Decree Entered November 19, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000647-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: X.A.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.E.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 10 EDA 2022 |

Appeal from the Decree Entered November 19, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000648-2021

J-S15031-22

| IN THE INTEREST OF: S.N.A.T., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: S.E.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 11 EDA 2022 |

Appeal from the Decree Entered November 19, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000649-2021

BEFORE: NICHOLS, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED JULY 28, 2022**

S.E.A. (Mother) appeals from the decrees involuntarily terminating her parental rights to her children: J.L.T. (a male born in April 2010); M.M.T. (a female born in June 2011); X.A.T. (a male born in September 2013); and S.N.A.T., Jr. ("S.N.A.T.") (a male born in September 2016) (collectively "Children").[1] We affirm.

The relevant factual and procedural history are as follows. In March 2019, the Philadelphia Police Department received a call concerning two adults who were unconscious in a car with two children. *See* Trial Court Opinion, 2/4/22, at 1. Police determined that the two adults were Mother and Mother's paramour, C.S., who had a suspended license and an open warrant for his

_____

[1] On December 21, 2021, the trial court terminated the parental rights of P.T., the biological father of J.L.T., M.M.T., and S.N.A.T. As of the date on which Mother filed the subjects appeals, a petition was pending before the trial court to involuntarily terminate the parental rights of A.L., the biological father of X.A.T.

- 2 -

arrest. *Id*. at 2. Police also determined that X.A.T. and another sibling were in the car, but were not in car seats, and that X.A.T. had significant bruising to his face. *Id*. Police observed evidence of drug use, including drug paraphernalia (straws and heroin bags) in the front of the vehicle. *Id*. At the time of the incident, C.S. was impaired and admitted to using heroin before driving the unregistered vehicle. *Id*. C.S. also admitted that the Philadelphia Department of Human Services ("DHS") was aware of the family and that a case manager visited the home on a regular basis. *Id*. DHS received a report from police regarding the incident, and thereafter visited the family at the home of C.S.'s parents. *Id*. Mother stated that C.S. was her paramour and Children's stepfather,[2] and that she and Children lived at the home of C.S.'s parents. *Id*.

In April 2019, DHS opened a case for the family and referred the family to the Community Umbrella Agency ("CUA"), which began in-home services and held an initial Single Case Plan ("SCP") meeting. *Id*. The Children's goal was identified as family stabilization, and Mother's objectives were to cooperate with CUA, transport Children to all medical and dental appointments, ensure that Children attended school, and ensure that Children did not have inappropriate sleeping arrangements. *Id*. at 2-3.

---

[2] In its opinion, the trial court refers to C.S. as "Stepfather."

On June 26, 2019, DHS received both a general protective services ("GPS") report and a child protective services ("CPS") report indicating that M.M.T., then age eight, had a ruptured right eardrum and bruising on her forehead, over her eyebrows, and on her lower back. *Id*. at 3. The GPS report further stated that M.M.T. had lost weight since November 2018. *Id*. The CPS report found that M.M.T. was malnourished, had a ruptured left eardrum, had wounds and abrasions all over her body, and on her knees, lower calves, above the left eye, and down her cheek. *Id*. The CPS report further indicated that M.M.T. was significantly underweight and repeatedly asked for food. *Id*. The reports were determined to be valid, and the CPS report identified Mother and C.S. as the perpetrators of the abuse. *Id*.

On that same date, DHS met with and interviewed the family at Chestnut Hill Hospital. *Id*. at 4. DHS noted the bruising all over M.M.T.'s body and that she was underweight and appeared malnourished. *Id*. M.M.T. indicated that she was hungry and had not eaten for several days. *Id*. DHS interviewed both Mother and C.S. Mother claimed that M.M.T. is clumsy and falls often, and that she regularly feeds Children but that M.M.T. steals food. *Id*. C.S. also claimed that M.M.T. frequently falls. *Id*. Hospital staff noted cigarette-like burns on the backs of X.A.T., then age five, and S.N.A.T., then age two. *Id*. The burn marks were in different stages of healing, and hospital staff indicated that the injuries were not consistent with Mother's explanations for the injuries. *Id*.

The next day, on June 27, 2019, DHS received another CPS report regarding Children's injuries. *Id*. at 5. The CPS report indicated that X.A.T. had scars all over his body in various stages of healing, and that both X.A.T. and S.N.A.T. had scars on their lower backs which were suspicious. Mother and C.S. were again identified as the perpetrators of the abuse. *Id*. at 5. DHS received a supplemental CPS report indicating that S.N.A.T. had healing fractures of his tenth and eleventh ribs. *Id*. Based on these reports, DHS obtained an order of protective custody ("OPC") for J.L.T., X.A.T., and S.N.A.T. *Id*. The following day, June 28, 2019, DHS obtained an OPC for M.M.T. *Id*. The trial court conducted a shelter for care hearing during which it lifted the OPCs for J.L.T., X.A.T., and S.N.A.T., and ordered their temporary commitment to DHS to stand. *See* N.T., 11/19/21, at 9. On July 1, 2019, the trial court held a shelter for care hearing during which it ordered M.M.T.'s temporary commitment to DHS to stand. *Id.* Mother and C.S. were found to be a grave threat and their visits with M.M.T. were suspended. *Id*. at 6.

On September 24, 2019, the trial court conducted a hearing at which it made a finding of child abuse against Mother and adjudicated Children dependent. *See* Trial Court Opinion, 2/4/22, at 6. The trial court referred Mother to the Clinical Evaluation Unit ("CEU") for a drug and alcohol screen, dual diagnosis assessment, and three random screens, and referred her to the Achieving Reunification Center ("ARC") for services, including housing, parenting, and domestic violence counseling. *Id*. The trial court further

ordered that Mother sign all necessary releases and consents and granted Mother supervised visitation at Children's discretion. *Id*.

CUA provided Mother with various objectives, including: obtaining safe and stable housing; compliance with CEU drug screen, dual diagnosis assessment, and random screens; compliance with ARC services for parenting, housing, employment, anger management, and domestic violence; verification of employment; maintenance of consistent contact with CUA; and attendance at supervised visitation. *See* N.T., 11/19/21, at 54-55, 62-66.

Over the next two years, the trial court held five permanency review hearings. The first three hearings occurred on December 19, 2019, March 10, 2020, and September 10, 2020. *See* Trial Court Opinion, 2/4/22, at 6-7. At each of these hearings, the court determined that Children's placement remained necessary and appropriate. *Id*. At the December 19, 2019 hearing, the trial court found Mother to be moderately compliant with the plan objectives and again referred her to ARC for all appropriate services. *Id*. at 6-7. At the March 10, 2020 hearing, the trial court found Mother to be substantially compliant with the plan objectives and ordered her to continue with her parenting and domestic violence services, to engage in family therapy, and referred her to CEU for a drug and alcohol screen and three random screens. *Id*. at 7. At the September 10, 2020 hearing, the trial court found Mother to be moderately compliant with the plan objectives and referred her to CEU for dual diagnosis assessment, a drug screen and three random

screens. *Id*. at 8. The trial court also ordered Mother to obtain a treatment plan, progress report, and attendance record as to her mental health treatment and to provide copies to CUA. *Id*. The trial court additionally ordered Mother to provide verification of employment and a copy of her lease to CUA. *Id*.

On January 18, 2021, DHS learned that Mother was suffering from medical issues which had caused her visitation to be inconsistent and her current unemployment. DHS also learned that Mother had vacated her previous apartment; and that she had not been as active with her mental health treatment due, in part, to the COVID-19 pandemic. *Id*.

On April 5, 2021, DHS learned that Mother's whereabouts were unknown, and that she had not visited Children in weeks. *Id*. On April 6, 2021, the trial court held a fourth permanency review hearing for Children, during which it found that Mother was not compliant with the permanency plan, and that she made no progress to alleviate the circumstances necessitating Children's placement. *Id*. On August 18, 2021, DHS learned that Mother's location was still unknown, and Mother had not visited the Children for several months. *Id*. at 9. The trial court held the final permanency review hearing on August 19, 2021, and, once again, found that Mother was not compliant with the permanency plan and that she made no progress towards alleviating the circumstances necessitating Children's placement. *Id*.

On November 1, 2021, DHS filed petitions to involuntarily terminate Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On November 19, 2021, the trial court conducted an evidentiary hearing on the petitions. At the time of the termination hearing, Children had been in DHS care since July 2019 (roughly twenty-nine months) due to founded CPS reports and various criminal matters concerning Mother, C.S.,[3] and I.C.[4] N.T., 11/19/2021, at 14-15, 52. Mother attended the hearing and was represented by counsel. Children's legal counsel and guardian *ad litem* also attended the hearing.

DHS presented the testimony of CUA Case Manager Supervisor James Johnson, who testified to the following. Mother was minimally compliant with her SCP objectives through the life of the case and made minimal progress toward alleviating the circumstances necessitating Children's placement. *Id*. at 84-85.

Other than participating in a housing program in January 2020, Mother did not complete her objective to obtain safe and stable housing for Children. *Id*. at 54-55, 63-64, 129. After DHS was informed that the whereabouts of

---

[3] C.S. physically abused J.L.T., M.M.T., and S.N.A.T., and was convicted of endangering the welfare of children at several dockets. *See* N.T., 11/19/21, at 12, 52; *see also* DHS Exhibit 12.

[4] I.C.'s relationship to the family is not explained in the record. I.C. perpetrated sexual offenses against J.L.T. and M.M.T., and was convicted in 2015 for these crimes at several dockets. *See* N.T., 11/19/21, at 12, 52; *see also* DHS Exhibit 12.

Mother were unknown, a parent locator search indicated that Mother's address was the home of C.S. *Id*. at 52. This information raised a concern regarding Mother's ability to keep Children safe and presented a barrier to reunification because C.S. was currently on probation for his physical abuse of M.M.T., X.A.T, and S.N.A.T. at that same address. *Id*. at 52-53. Although Mother claimed that she was staying with her brother and his wife, Mother did not provide lease information and declined to permit DHS to verify their house because Mother does not get along with her brother and sister-in-law, and Mother did not want them in her business. *Id*. at 126.

Regarding Mother's drug screening objective, Mother did not have a consistent track record of random screens in her file. *Id*. at 56, 62. When Mother finally reappeared in August 2021, she attended random screens on August 19, 2021, and November 8, 2021. *Id*. at 58-61. The August 19, 2021 screen indicated that Mother was positive for benzodiazepines, cocaine, and opiates, and that trace amounts of marijuana and PCP were also detected. *Id*. at 59-60. DHS was particularly concerned about the PCP because it was one of the main drugs of choice for Mother when the case first began. *Id*. at 62. The November 9, 2021 screen was negative; however, it indicated trace amounts of amphetamines, barbiturates, opiates, benzodiazepines, cocaine, PCP, and marijuana. *Id*. at 60-61. Mother failed to provide treatment verification, and instead self-reported that she was in treatment, but did not disclose where the facility was located. *Id*. at 59. CUA has no verification

that Mother attended a drug or alcohol program, nor any verification of treatment plans or evaluations that would indicate that she participated in mental health or dual diagnosis treatment. *Id*. at 56-57, 61.

Mother did not provide verification of employment; however, on one occasion when Mother was scheduled for a random drug screen, she claimed that she had a conflict with work, but failed to provide any proof of her work schedule to confirm this conflict. *Id*. at 63, 64, 129. Mother did not complete anger management and domestic violence programs, and therefore was never able to progress beyond supervised visitation. *Id*. at 64-66.

Regarding her objective to maintain consistent contact with CUA, prior to August 19, 2021, Mother did not maintain contact with CUA other than to set up visits with Children. *Id*. at 65. Mother did not participate in SCP meetings. *See* Trial Court Opinion, 2/4/22, at 6-8. Furthermore, for approximately one year, Mother's whereabouts were unknown.[5] *See* N.T., 11/19/21, at 55, 127-28. CUA attempted to contact Mother, without success, until she reported to the CUA supervisor in August 2021. *Id*. at 65-67, 125, 127.

Mother attended some visitation; however, her failure to complete ARC services for domestic violence and anger management prevented her from

_____

[5] The record did not provide the specific date on which Mother initially disappeared. However, the record indicates that Mother was missing from late 2020 to August 2021. *See* N.T., 11/19/21, at 127-28.

- 10 -

progressing beyond supervised visitation with Children.[6] *Id*. at 64-66. After Mother reappeared in August 2021, CUA set up a schedule for her, but she was not consistent with the visits and did not provide an explanation for the inconsistencies. *Id*. at 66-67. Although Children and Mother have positive interactions, redirection is sometimes needed because Mother gives false promises to Children regarding her progress and tells them she will be getting them back soon. *Id*. at 67. Mother does not inquire about any of the Children's medical, therapeutic, or educational needs. *Id*. at 85.

Johnson additionally testified as to Children's respective placements in foster care, as well as their progress and preferences. DHS also presented the testimony of legal counsel for Children who testified as to their placements, progress, and preferences.

Mother testified at the hearing that her lack of contact from late 2020 through August 2021 was because she was taking care of her father. *Id*. at 128. Mother claimed that she missed visits with Children because a CUA worker was on vacation, and then she was not permitted to attend visitation until providing proof of vaccination. *Id*. at 143-44. Mother confirmed that she receives her mail at the address where C.S. lives, but stated that she does so because C.S.'s mother resides there and brings the mail to Mother. *Id*. at 158-59. Mother claimed that she completed a parenting program in May 2020

---

[6] The record is not clear regarding the frequency of Mother's visitation prior to her disappearance in late 2020.

and presented a certificate from Congreso, a Philadelphia non-profit organization, at the hearing; however, Mother did not inform CUA of the program and CUA had no record of Mother's attendance. *Id*. at 134-35. Mother testified that she completed every program that ARC asked her to complete. *Id*. at 135. Mother testified that she obtained Xanax from a friend to treat her anxiety. *Id*. at 148. Mother denied using cocaine but claimed it may have been mixed with K2[7] that she smoked with a friend. *Id*. Mother claimed that she was prescribed opiates for chronic pain and a surgery scheduled for broken teeth. *Id*. at 150. Mother testified that she has been receiving anger management therapy since 2019 and sees a mental health therapist weekly, but she provided no documentation to support these assertions. *Id*. at 136, 138, 152-53.

On November 19, 2021, the trial court entered decrees involuntarily terminating Mother's parental rights to Children pursuant to subsections 2511(a)(2), (5), (8), and (b). On December 17, 2021, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court *sua sponte* consolidated Mother's appeals. The Children's guardian *ad litem* filed a brief in support of affirming the decrees. The trial court filed a Rule 1925(a) opinion.

---

[7] The trial court explained that K2 is also known as synthetic marijuana. ***See*** Trial Court Opinion, 2/4/22, at 14.

- 12 -

Mother presents the following issues for our review:

A. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under [subsections] 2511(a)(1), (2), (5), and (8)?

B. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by [subsection] 2511(b)?

Mother's Brief at 4 (unnecessary capitalization omitted).[8]

Our standard of review of a decree involuntarily terminating parental rights is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.

_____

[8] Although Mother purports to challenge the trial court's finding that termination was warranted under subsection 2511(a)(1), the trial court made no such finding.

- 13 -

Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by section 2511 and requires the trial court to conduct a bifurcated analysis of the grounds for termination under subsection (a) followed by the consideration of the needs and welfare of the child under subsection (b). The initial focus is on the conduct of the parent. ***See In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies one of the statutory grounds for termination delineated in section 2511(a). ***Id***. Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b), relating to the needs and welfare of the child. ***Id***. We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Mother's parental rights to Children pursuant to subsections 2511(a)(2), (5), (8), and (b). Where, as here, the trial court determines that there are grounds for termination under more than one subsection of section 2511(a), we need only agree with the

trial court's determination as to any one subsection of 2511(a) in order to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004). Given this latitude, we analyze the court's termination decrees pursuant to subsection (a)(2), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). With regard to the termination of parental rights pursuant to section 2511(a)(2), this Court has indicated:

> In order to terminate parental rights pursuant to [section] 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

**In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct and may include acts of refusal as well as incapacity to perform parental duties. **See In re S.C.**, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). Parents are

- 15 -

required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **See Matter of Adoption of M.A.B.**, 166 A.3d 434, 443 (Pa. Super. 2017). As such, a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. **See In re S.C.**, 247 A.3d at 1105.

With respect to subsection 2511(a)(2), Mother asserts that, although she had problems maintaining contact with CUA, she reconnected with the CUA supervisor in August 2021. Mother's Brief at 12. Mother claims that she receives her mail at C.S.'s address, but she does not go to the home because C.S.'s mother brings Mother her mail. **Id**. Mother indicates that CUA has documentation that she completed an ARC housing program and a parenting program through Congreso. **Id**. Mother points to her testimony that she "completed every program" that ARC asked her to complete and is currently attending therapy and anger management, and argues that she "has made substantial progress during the course of the case and has demonstrated a willingness to remedy the conditions and causes of the incapacity, abuse, neglect or refusal to perform parental duties." **Id**. at 13.

The trial court considered Mother's challenge to its findings under subsection 2511(a)(2) and concluded that her challenge lacked merit. The trial court found CUA Case Manager Supervisor Johnson's testimony to be credible, including his testimony that Mother was minimally compliant with

her plan objectives through the life of the case and had made minimal progress towards alleviating the circumstances necessitating Children's placement. *See* Trial Court Opinion, 2/4/22, at 12. The court reasoned:

> Mother may have attended a parenting and housing program, but the vast majority of her SCP objectives remained incomplete by the time of the termination trial. Mother has displayed a passive interest in the Children's needs. Mother did not focus on helping meet the Children's present needs for their physical and mental well-being. . . . Mother has had ample opportunity to put herself in a position to adequately parent and care for Children, but her repeated and continued incapacity has not been mitigated. Mother is unable to meet Children's basic present and future physical and emotional needs. Mother has demonstrated an unwillingness to acknowledge or remedy the causes of her incapacity to parent in order to provide Children with essential parental care, control, or subsistence necessary for their physical and mental well-being.

Trial Court Opinion, 2/4/22, at 16-17.

The record supports the trial court's findings and credibility determinations. Mother was minimally compliant with her objectives, despite having more than two years to complete them. *See* N.T., 11/19/21, at 84-85. Mother's whereabouts were unknown for an extended period of time, from late 2020 until August 2021. *Id*. at 127-128. During this time, she missed visitation and failed to complete a PCE that was ordered by the trial court. *See* Trial Court Opinion, 2/4/22, at 8-9. Upon return, Mother tested positive for benzodiazepines, cocaine, and opiates. *See* N.T., 11/19/21, at 56-61. During her testimony, Mother admitted to obtaining and using Xanax from a friend and smoking K2. *Id*. at 148. Even after reappearing, Mother was

inconsistent with visitation, and in the two weeks prior to the termination hearing, she did not confirm or show up for the visits. *Id*. at 66-67.

Furthermore, despite Mother's testimony that she has completed every program that ARC asked her to complete, CUA's only documentation from ARC was for a housing program. *Id*. at 63-64, 129. Mother did not provide documentation regarding a parenting program she participated in through Congreso until the day of the termination hearing. *Id*. at 63-64, 129-30. Although Mother testified that she either completed or is attending programs elsewhere, including programs for therapy and anger management, she provided no documentation to support this assertion. *Id*. at 135-136. Because Mother, who was found to be the perpetrator of abuse to Children, did not complete the programs related to domestic violence and anger management, Mother never progressed beyond supervised visitation with Children. *Id*. at 64-66.

Moreover, Mother failed to obtain suitable and safe housing. Mother indicated to CUA that she was staying at the home of her brother and sister-in-law. *Id*. at 54, 126. However, Mother declined to permit CUA to evaluate the home because she does not get along with her brother and sister-in-law. *Id*. at 126. Mother was also receiving her mail at the address of C.S., who was convicted of abusing three of the Children, which presented concerns regarding Mother's ability to keep the Children safe. *Id*. at 52-53. Overall, Mother's progress toward resolving the dependency was minimal, and she did

not inquire about Children's medical, behavioral, therapeutic, or educational needs. *Id*. at 84-85.

The foregoing testimonial evidence supports the trial court's conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal to satisfy her permanency objectives has caused Children to be without parental care, control, or subsistence necessary for their physical or mental well-being. Even after reappearing from an extended absence, Mother was inconsistent with visitation; tested positive for cocaine, benzodiazepines, and opiates; failed to progress beyond supervised visitation; continued to receive her mail at the home of C.S., who was convicted of abusing three of the Children; and did not involve herself in discussions with CUA regarding Children's medical, therapeutic, or educational needs. As such, the record supports the court's conclusion that the conditions and causes of Mother's incapacity, abuse, neglect, or refusal cannot or will not be remedied. Accordingly, we discern no error or abuse of discretion by the trial court in determining that termination of Mother's parental rights to Children was warranted under subsection 2511(a)(2). Therefore, Mother's first issue merits no relief.

In her second issue, Mother challenges the trial court's finding that termination of her parental rights was in Children's best interests under subsection 2511(b). As explained above, where grounds for termination under any subsection of section 2511(a) are met, the trial court shall then give primary consideration to the developmental, physical and emotional

needs and welfare of the child under subsection 2511(b). *See In re T.S.M.*, 71 A.3d at 267. The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. *Id*. The determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. *Id*. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond. *Id*.

The evaluation of a child's bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Moreover,

> [w]hile a parent's emotional bond with his or her child is a major aspect of the [s]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . ..

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

While a parent may profess to love the child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125 (citation omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Mother argues that the Children recognize her and enjoy when she visits. Mother's Brief at 15. Mother also claims that X.A.T wishes to live with Mother. *Id*. Mother further argues that "[s]ince the evidence failed to establish that the relationship between Mother and Children was severed, it is clear that DHS has not [met] its burden that termination is in the best interests of the [C]hildren." *Id*.

In its opinion, the trial court acknowledged that Children recognize Mother and that, when she does visit, Children enjoy their visits with her. *See* Trial Court Opinion, 2/4/22, at 25. Nevertheless, the trial court determined

that termination of Mother's parental rights was in Children's best interests.

The court reasoned:

> Mother has been very inconsistent in attending her supervised visits.  For a period of a year, Mother's whereabouts were unknown; therefore, visits did not occur with . . . Children.  After the August 19, 2021, hearing, when Mother resurfaced from her long absence, CUA set up a visitation schedule for Mother to attend at the agency.  Mother made some visits, but eventually stopped confirming or showing up.  Mother has assumed no responsibility to develop a real bond with all the Children.  Mother's lack of consistent visitation has had a detrimental impact on the Children, in particular [X.A.T.] and [S.N.A.T.].  Mother has not shown a willingness to learn appropriate parenting skills or the ability to provide stability for the Children.  Children continue to present with behavioral concerns and will require therapeutic services due to their behaviors for their physical and mental well-being in the future.  Mother never graduated beyond supervised visitation.  The record reflects that it would be detrimental to remove any of the Children from their current placements.  . . . Children have not been in Mother's custody for twenty-nine months.  The respective foster parents provide for Children and ensure all their needs for their safety, welfare, and emotional well-being are met.  Mother has had little to do with Children's upbringing.  Termination would not destroy an existing, necessary and beneficial relationship with Mother for any of the Children[, and] . . . it is in the Children's best interest to terminate Mother's parental rights so that all the Children may be freed for adoption.

*Id*. at 25-26.

Our review of the record supports the trial court's findings that Children's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to subsection 2511(b). Although Children recognize Mother and enjoy her inconsistent visits, the record establishes that any bond they share with Mother is not healthy, beneficial, or necessary.

The record reflects that J.L.T., who was eleven at the time of the hearing, is extremely happy and bonded with his foster parents, looks to them to meet his basic daily needs, and wishes to be adopted by them and assume their last name. *Id*. at 32, 69, 164. J.L.T. does not wish to visit Mother. *Id*. at 163. J.L.T. cannot be safely returned to Mother's care and the termination of her rights would not cause harm beyond repair to him. *Id*. at 69.

Regarding M.M.T., who was ten at the time of the hearing, the record reflects that, although she loves and cares about Mother, she does not wish to live with Mother. *Id*. at 164. M.M.T. wishes to remain in her current treatment-level foster care placement, where she is happy and bonded with her caregivers and wants it to be her "forever home." *Id*. at 35-36, 83, 110, 164. M.M.T. could not be safely reunified with Mother and removing her from her current placement would be detrimental or damaging. *Id*. at 84. M.M.T. would not suffer harm beyond repair if Mother's parental rights were terminated. *Id*. at 84.

Regarding X.A.T., who was eight at the time of the hearing, the record reflects that he loves Mother, is attached to her, and would like to live with her. *Id*. at 164. However, such attachment is not healthy because Mother has not provided stable care for X.A.T. for three years, and she is still not able to provide for X.A.T.'s needs. *Id*. at 75-76. While Mother's whereabouts were unknown, X.A.T.'s behaviors were improving, and his school reported that he was doing somewhat better. *Id*. at 73-76, 118. However, when Mother

returned in August 2021, X.A.T.'s negative behaviors drastically increased. *Id*. at 74. X.A.T. has a behavioral consultant, but he still needs a therapist. *Id*. at 99-100. X.A.T.'s current placement in treatment-level foster care is going well and he is happy in his placement.[9] *Id*. at 118. Further, it would be unsafe for X.A.T. to be in a placement where his behavioral and therapeutic needs were not addressed. *Id*. at 76.

Regarding S.N.A.T., who was five at the time of the hearing, the record reflects that he does not inquire about Mother, does not miss Mother, and does not want to reside with Mother. *Id*. at 165. S.N.A.T. is happy in his current placement, has a healthy bond with his foster parent, and looks to his foster parent to meet his basic needs. *Id*. at 33, 72, 116. S.N.A.T. could not be safely returned to Mother's care. *Id*. at 72-73, 116.

In sum, the evidence of record indicates that since July 2019, Children have not relied on Mother to meet their basic needs, and their needs have been met by their respective foster parents. J.L.T. and M.M.T. both indicated that they would like to be free for adoption. S.N.A.T. indicated that he does not miss Mother and does not want to live with Mother. Although X.A.T. indicated he would like to stay with Mother, it is clear from the record that the bond he has with Mother is not healthy, necessary, or beneficial based on the

---

[9] X.A.T.'s placement is not pre-adoptive, but his foster parent is open to potentially being a permanency resource. *See* N.T., 11/19/21, 76-77, 166-68. Additionally, X.A.T.'s paternal grandmother and maternal aunt are interested in being resources for X.A.T. *Id*. at 77-78.

extended period of time he has been in the custody of DHS, Mother's inability to remedy the underlying deficits of her parenting in a reasonable amount of time, and the permanency needs of X.A.T. Children are entitled to permanency and stability, and their lives cannot be put on hold in the hope that Mother will one day summon the ability to handle the responsibilities of parenting. Thus, the record establishes by clear and convincing evidence that termination will serve the developmental, physical, and emotional needs and welfare of Children.

Accordingly, we conclude that the record supports the trial court's factual findings and credibility determinations that grounds exist for the termination of Mother's parental rights under [subsections] 2511(a)(2) and (b). As we discern no abuse of discretion by the trial court, we affirm the decrees involuntarily terminating Mother's parental rights to Children.

Decrees affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: *7/28/2022*